**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

_____

In re:

LYNX ASSOCIATES, L.P.

Debtor.

_____:

:
:
:
:
:
:
:
:
:
:
:

Civil Action No. 08-0883 (JAG)

**OPINION**

**GREENAWAY, JR., U.S.D.J.**

This matter comes before this Court on an appeal filed by RM 14 FK Corporation ("Remainderman" or "Appellant"), seeking review of the Amended Order Confirming the Fourth Amended Plan of Reorganization of Lynx Associates, L.P. ("Amended Plan"), dated November 29, 2007, issued by Judge Novalyn L. Winfield of the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court"), in Case No. 04-48749. For the reasons set forth below, the Bankruptcy Court's order will be affirmed.

**BACKGROUND**

The events that form the backdrop for this case involve a series of complex business transactions. Rather than attempting to paraphrase the history of these transactions, this Court will rely, in relevant part, upon the Restated Disclosure Statement Regarding Plan of Reorganization for Lynx Associates, L.P. ("Restated Plan" or "Restated Disclosure Stmt.") The

1

statement of facts is as follows:

In 1983, Kmart Corporation ("Kmart") sold to Lynx Properties Corporation ("LPC") fourteen parcels of real property (each a "Property" and collectively, the "Properties") (Restated Disclosure Stmt. 3, ¶ 1[Bankr. Dkt. 606].)  LPC, in turn, leased the Properties back to Kmart under separate "triple net"[1] operating leases for each Property ("Operating Leases").  LPC financed the purchase of the Properties from Kmart (each a "Mortgage Loan" and collectively, the "Mortgage Loans").  None of the Mortgage Loans has a cross-default[2] or a cross-collateralization provision.[3]  Each Mortgage Loan is a non-recourse[4] obligation of the Debtor. (Id. ¶ 3.)  Each Mortgage Loan is evidenced by a promissory note dated November 15, 1983 (individually, a "Note" and collectively, the "Notes").  Each of the Notes is separately secured by the following ("Security Documents"): (i) a fee mortgage deed or deed of trust on the Property, and (ii) an assignment of the Operating Lease for such Property.  (Id. ¶ 4.)  The Notes have a maturity date of January 1, 2009.  Kmart, in turn, sold participation interests in the Mortgage

---

[1] A triple net lease is a lease agreement that "designates the lessee (the tenant) as being solely responsible for all of the costs relating to the asset being leased in addition to the rent fee applied under the lease. The structure of this type of lease requires the lessee to pay for net real estate taxes on the leased asset, net building insurance and net common area maintenance. The lessee has to pay the net amount of three types of costs, which is how this term got its name." http://www.answers.com.

[2] A cross-default provision is a "provision in a loan agreement that puts the borrower in default if the borrower defaults on another obligation." http://www.investorpedia.com.

[3] A cross-collateralization provision is a term used when the "collateral for one loan also serves as collateral for other loans." http://www.moneyglossary.com.

[4] A non-recourse loan is a "debt whose satisfaction may be obtained on default only out of the particular collateral given and not out of the debtor's other assets." http://research.lawyers.com/glossary/non-recourse.html.

Loans to investors.  Those interests were evidenced by certificates issued to investors.  National

Bank of Detroit ("NBD") acted as Trustee[5] for the certificate holders under a trust indenture, and

the Notes and Security Documents were assigned to NBD.  (Id. ¶ 5.)

In 1984, LPC conveyed its various interests in the Properties to various entities as

follows:

(A)  LPC leased its interests in the Properties under a single lease ("Master Lease") to
Malease 14 FK Corp. ("Master Lessee") and transferred all of its interests in the
Operating Leases.

(B)  LPC conveyed to Lynx Associates ("Debtor") an estate for years in each of the
Properties, which expires on January 2, 2011 (individually an "Estate for Years" and
collectively, the "Estates for Years") and a fee interest in all buildings and improvements
on the Properties.

(C)  LPC conveyed to RM 14 FK Corp. ("Remainderman") a remainder in the fee of each
property, subject to the Operating Leases, the interests of the Master Lessee, the Estates
for Years held by Debtor and the Security Documents.  Concurrent with this transaction,
the Remainderman granted the Debtor an option (exercisable following the expiration of
the Estates for Years) to lease each Property for an initial term and consecutive renewal
terms.

(D)  On June 16, 1984, the Debtor, the Master Lessee and the Remainderman executed
fourteen three party agreements (the "Three Party Agreements") for each Property.

(Id. ¶ 5.)

In 1999, the Debtor obtained a modification of the payment terms of the Mortgage Loans

held by NBD.  Courtland Deposit Corporation ("CDC") purchased the Notes and Security

Documents from NBD; Debtor and CDC executed fourteen note payment modification

agreements which modified the payment terms of the Mortgage Loans; and the Notes, the

Security Documents and the Operating Leases were assigned to Bank One Trust Company, N.A.

---

[5] In order to avoid confusion between the Trustee for the certificate holders and the
bankruptcy trustee, the bankruptcy trustee will be referred to as the "United States Trustee."

("Bank One"), as Trustee for new certificate holders.[6] (Id. 5, ¶ 1.) As a result of the 1999 modification transaction, the Mortgage Loans were held by Bank One as Trustee for the new certificate holders and the Mortgage Loans were self-liquidating[7] and scheduled by their own terms to mature on January 1, 2009, prior to the expiration of the Estates for Years. (Restated Disclosure Stmt. 5, ¶ 2 [Bankr. Dkt. 606].)

In January 2002, both Kmart and Master Lessee, separately, commenced cases under chapter 11 of the Bankruptcy Code. On July 1, 2002, pursuant to a stipulation entered into in the Master Lessee's bankruptcy case, the Debtor became the owner of the Master Lessee.[8] (Id. 5, ¶ 4-6.)

As a result of foregoing bankruptcies, the Operating Leases and certain subleases were affected as follows:

(A) Kmart assumed the Operating Lease for the Property located in Groveport, Ohio.

(B) Buffett Partners, L.P. assumed the interest of Cafeteria Operators, L.P. ("Subtenant"), under certain subleases affecting those Properties located in: Tucson, Arizona; Richardson, Texas; and Dallas, Texas.

(C) All other Operating Leases with Kmart and subleases with Subtenant were rejected.

---

[6] The new certificate holders, are and continue to be, the Teachers Insurance Annuity Association of America ("Teachers"), Monumental Life Insurance Company ("Monumental") and Southern Farm Bureau Life Insurance Company ("Southern Farm"). (Restated Disclosure Stmt. 5, ¶ 2 [Bankr. Dkt. 606]); (Confirmation H'rg Tr. 21:15-22, Nov. 14, 2007.)

[7] Self-liquidating refers to a "[c]ost, expense, or obligation that carries with it the mechanism for its own repayment or fulfillment." http://www.businessdictionary.come/definition/self-liquidating.html.

[8] Prior to stipulation, the owner of the Master Lease and owner of the Remainderman were the same.

4

(D)  Bank One entered into a Non-Disturbance Agreement[9] with Buffett Partners, L.P., covering the Furr's Subleases.

(Id. 6, ¶ 3.)

On November 5, 2002, the Mortgage Loan secured by the North Bergen Property was satisfied, and the North Bergen Property was transferred by the Debtor to a third party, leaving the Notes secured by the Security Documents remaining on the thirteen Properties in nine states. J.P. Morgan Trust Company, NA ("JP Morgan") succeeded Bank One as Trustee for Teachers, Monumental and Southern Farm.  (Id. 6, ¶ 2.)

On June 10, 2004, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the U.S. Bankruptcy Court for the District of Nevada.  On September 9, 2004, an order was entered transferring venue of this chapter 11 case to the District of New Jersey.  (Id. 8, ¶ 3.)

On July 8, 2005, the Debtor filed its initial Plan of Reorganization of Lynx Associates, L.P.  The initial plan was amended thereafter with the Debtor filing its Fourth Amended Plan of Reorganization of Lynx Associates, L.P. (the "Plan") along with its Fourth Amended and Restated Disclosure Statement Regarding Plan of Reorganization of Lynx Associates on September 24, 2007.

On September 27, 2007, the Bankruptcy Court entered an Order Approving Disclosure Statement and Fixing Time for Filing Acceptances or Rejections of Plan, Combined with Notice Thereof (the "Disclosure Statement Approval Order") over the objection of the Remainderman.

---

[9] A non-disturbance agreement is an "agreement between a tenant (or lessee) and the landlord's (or lessor's) lendor to ensure the tenant will remain in possession of leased property, despite any foreclosure action against the landlord, and that, in such circumstances, the tenant may pay rent directly to the lender." http://www.businessdictionary.com.

(Order Approving Disclosure Statement and Fixing Time for Filing Acceptances or Rejections of Plan, September 27, 2007.)

The Debtor received two objections to the Plan.  The United States Trustee filed a Limited Objection to Confirmation of the Fourth Amended Plan of Reorganization of Lynx Associates, L.P. dated October 25, 2007 (the "UST Limited Objection") and the Remainderman filed an objection to the Fourth Amended Plan of Reorganization for Lynx Association, L.P. (the "Remainderman Objection"), dated October 25, 2007.  The UST Limited Objection was resolved consensually and the United States Trustee subsequently withdrew its objection to the Plan.  (Confirmation H'rg. Tr. 66:1-25, November 14, 2007.)

On November 14, 2007, the Bankruptcy Court held a hearing to confirm the Plan.  The Remainderman, during the confirmation hearing, raised two objections concerning Debtor's Plan.  The Remainderman objected to the Debtor's assumption of the Las Vegas and Independence Operating Leases and also to the non-debtor releases provided under the Plan's provisions.[10]  Subsequently, the Bankruptcy Court concluded that Remainderman lacked standing to object to the Plan, except with regard to the non-debtor releases.  (Id. 54:13-14.) Ultimately, the Bankruptcy Court overruled Remainderman's objection as to the non-debtor releases and confirmed Debtor's Plan.  On November 16, 2007, the Bankruptcy Court entered

---

[10] Remainderman objected to Debtor's Confirmation Plan based on the assumption of the Las Vegas and Independence Operating Leases.  Remainderman asserted that Debtor was required to cure the alleged default, Debtor's non-payment of rent as it relates to these Properties, pursuant to 11 U.S.C. § 365(b)(1).  (Remainderman Br. 14-15.) Also, Remainderman objected to the release of non-debtors provided in the Plan.  Remainderman asserted that these releases are against bankruptcy policy and the releases in this specific matter do not meet the elements of (1) fairness; (2) necessity to the organization; (3) the exchange of reasonable consideration; and (4) specific factual findings by the Bankruptcy Court relative to these factors.

its Order Confirming Debtor's Fourth Amended Plan of Reorganization Pursuant to chapter 11 of the United States Bankruptcy Code (the "Confirmation Order").

On November 26, 2007, the Remainderman filed a Notice of Appeal of the Confirmation Order.  Also on November 26, 2007, Debtor requested that the Court modify the Confirmation Order.[11]  The Trustee consented to the modification.  No hearing was held before the entry of the Amended Confirmation Order, although both the Debtor and Remainderman submitted letters to the Bankruptcy Court addressing whether the Amended Confirmation Order should be entered, respectively supporting and opposing entry of the Amended Order.

On November 29, 2007, the Bankruptcy Court entered the Amended Order Confirming Debtor's Fourth Amended Plan or Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code (the "Amended Confirmation Order").  On November 30, 2007, Remainderman filed a Notice of Appeal of the Amended Confirmation Order Confirming, but did not seek any relief staying the Plan or distributions made thereunder.  The two appeals were consolidated by order of this Court, dated March 26, 2008.

In the appeal before this Court, Remainderman now raises the issues of: (1) whether the Bankruptcy Court had authority to enter the Modified Confirmation Order, following the filing of the Notice of Appeal with respect to the Confirmation Order; (2) whether executory agreements purported to be assumed under the Fourth Amended Plan of Reorganization of Lynx

---

[11] The Confirmation Order was amended to include this provision: "North Bergen Order: Pursuant to agreement between the Debtor and the Trustee, the requirement in Article 5.1(v) of the Plan that the North Bergen Order shall have become a Final Order as a condition to the Effective Date is hereby waived, as to the North Bergen Order, so long as (i) no stay is granted with respect to any appeal of the North Bergen Order; and (ii) the North Bergen Proceeds are distributed to the Trustee and the Debtor on or before the Effective Date in strict compliance with the North Bergen Order."  (Confirmation Order ¶ 15 [Bankr. Dkt. 663].)

Associates, L.P. may be assumed without curing defaults; (3) whether the Bankruptcy Court erred in granting releases of non-debtor parties; and (4) whether the Bankruptcy Court erred in finding that Appellant lacked standing to object to confirmation of the Fourth Amended Plan of Reorganization of Lynx Associates, L.P., other than to object to release of non-debtor parties.[12] (Remainderman Stmt. of Issues on Appeal 1.)

## JURISDICTION

This Court has jurisdiction to hear this case, pursuant to 28 U.S.C. § 158(a), which states, in pertinent part, that "[t]he district courts of the United States shall have jurisdiction to hear appeals (1) from final judgments, orders, and decrees . . . of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges."  The order of the bankruptcy judge in the instant case is final, and therefore reviewable, pursuant to 28 U.S.C. § 158(a)(1).  "Pursuant to FED. R. BANKR. P. 8013, a federal district court may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings."  Ryker v. Current, 338 B.R. 642, 646 (D.N.J. 2006).

In bankruptcy appeals, district courts, pursuant to FED. R. BANKR. P. 8013, should uphold findings of fact unless they are clearly erroneous.  FED. R. BANKR. P. 8013; Resyn Corp. v. United States, 851 F.2d 660, 664 (3d Cir. 1988).  A finding of fact is clearly erroneous when, although there is evidence to support it, in consideration of the entire record, the reviewing court

---

[12]  Remainderman included one additional issue in its statement of issues on appeal, the question of whether distributions to be made pursuant to the Fourth Amended Plan of Reorganization of Lynx Associates, L.P. are contrary to the provisions of 11 U.S.C. § 1129. However, Remainderman did not brief this issue and therefore is deemed to have abandoned it. United States v. Pelullo, 399 F.3d 197, 222 (3d Cir. 2005) ("It is well settled that an appellant's failure to identify or argue an issue in his opening brief constitutes waiver of that issue on appeal.").

is left with the definite and firm conclusion that a mistake has been committed.  United States v. Gypsum Co., 333 U.S. 364, 395 (1948).  By contrast, in reviewing orders of the bankruptcy court, this Court reviews questions of law de novo.  See In re Continental Airlines, Inc., 203 F.3d 203, 208 (3d Cir. 2000) (citing Manus Corp. v. NRG Energy, Inc., 188 F.3d 116, 122 (3d Cir. 1999)).

In the instant case, Appellant is seeking review of legal conclusions made by the bankruptcy judge.  Thus, review by this Court is de novo.

## DISCUSSION

## A.  Does the Appellant Have Standing to Appeal

As a threshold matter, this Court must address whether Remainderman has standing to appeal the confirmation of Debtor's Plan of Reorganization.[13]  Standing to appeal in a bankruptcy case is limited to "persons aggrieved" by an order of the bankruptcy court.  Gen'l Motors Acceptance Corp. V. Dykes (In re Dykes), 10 F.3d 184, 187 (3d Cir. 1993); In re Combustion Eng'g. Inc., 391 F.3d 190, 214 (3d Cir. 2004).  The "person aggrieved" test is a prudential standing requirement limiting bankruptcy appeals to persons whose rights and interests are "directly and adversely affected pecuniarily by order or decree of the bankruptcy court."  In re Combustion Eng'g. Inc., 391 F.3d at 214 (citing In re Dykes, 10 F.3d at 187).  A "person aggrieved" must show the order of the bankruptcy court "diminishes their property, increases their burdens, or impairs their rights."  In re PWS Holding Corp., 228 F.3d 224, 249

---

[13] Neither the Debtor nor Remainderman raised the issue of whether Remainderman has standing to appeal the current matter.  However, standing to bring this appeal is a preliminary matter that must be addressed prior to considering any issues on appeal.  Even if a party fails to raise the issue of standing, because standing is a jurisdictional requirement, the court has the authority and duty to raise the issue sua sponte when necessary.  See Steele v. Blackman, 236 F.3d 130, 134 n.4 (3d Cir. 2001).

(3d Cir. 2000).  Whether someone is a person aggrieved is normally a question of fact.  In re

Dykes, 10 F.3d at 188.

Appellate standing in the bankruptcy context is more restrictive than Article III standing.

In re Combustion Eng'g. Inc., 391 F.3d at 215.  In order to have appellate standing, a party must

be a "person aggrieved" by the decision of the bankruptcy court.  The person aggrieved standard

exists to insure that bankruptcy proceedings are not unreasonably delayed.  Id.  As such, courts

have denied standing to parties involved in bankruptcy proceedings "who, even though they may

be exposed to some potential harm incident to the bankruptcy court's order, are not 'directly

affected' by that order."  Travelers Ins. Co., v. H.K. Porter Co., 45 F.3d at 737, 741 (3d Cir.

1995).  Standing is not dispensed in gross, but rather is determined by the specific claims

presented.  See Int'l Primate Prot. League v. Adm'r of Tulane Educ. Fund, 500 U.S. 72, 77

(1991).

This restrictive approach to bankruptcy appellate standing contrasts with the broad right

of participation in the early stages of bankruptcy proceedings.  In re Combustion, 391 F.3d at

214, n.21.  Under Bankruptcy Code § 1128(b), any "party in interest" may object to plan

confirmation during the confirmation hearing.  Id. (citing 11 U.S.C. § 1128(b)).  The Code

defines "party in interest" to include "the debtor, the trusteee, a creditor's committee, an equity

security holders' committee, a creditor, an equity security holder, or any indenture trustee."  Id.

§ 1109(b).  "This list is not exhaustive, however . . . and § 1109(b) has been construed to create

a broad right of participation in chapter 11 cases."  In re Combustion, 391 F.3d at 214, n.21; see

In re Amatex Corp., 755 F.2d 1034, 1042 (3d Cir. 1985) ("The predecessor provisions of section

1109(b) of the Code constituted an effort to encourage and promote greater participation in

10

reorganization cases . . . [and] section 1109(b) continues in this tradition[.]") (citations omitted); In re PWS Holding Corp., 228 F.3d at 249 (Section 1109(b) "confers broad standing at the trial level").

Before reaching the merits of Remainderman's appeal, this Court will review the Remainderman's issues on appeal to determine whether it has standing to bring these claims. The issues on appeal are (1) whether the Bankruptcy Court had authority to enter the Modified Confirmation Order, following the filing of the Notice of Appeal with respect to the Confirmation Order; and (2) whether executory agreements purported to be assumed under the Fourth Amended Plan of Reorganization of Lynx Associates, L.P., may be assumed without curing defaults; and (3) whether the Bankruptcy Court erred in granting releases of non-debtor parties; and (4) whether the Bankruptcy Court erred in finding that Appellant lacked standing to object to confirmation of the Fourth Amended Plan of Reorganization of Lynx Associates, L.P., other than to object to releases of non-debtor parties.  See (Remainderman RM 14 FK Corp. Br. [hereafter "Remainderman Br."].)

### 1.  Whether the Bankruptcy Court had authority to enter the Modified Confirmation Order, following the filing of the Notice of Appeal with respect to the Confirmation Order

Remainderman questions whether the Bankruptcy Court had authority to enter the Modified Confirmation Order of November 29, 2007.  The Remainderman argues that the Bankruptcy Court did not have jurisdiction[14] to enter the Modified Confirmation Order on

---

[14] As a general principle, filing a notice of appeal divests the district court of its control over the aspects of the case involved in the appeal and confers jurisdiction to the court of appeals.  Griggs v. Provident Consumer Co., 459 U.S. 56, 57 (1982).  The theory of divestiture of jurisdiction from the trial court to the appellate court applies to bankruptcy cases as well.  In re Transtexas Gas Corp, 303 F.3d 571, 580 (5th Cir. 2002).  The filing of a notice of appeal with a

(continued...)

November 29, 2007, due to the fact Remainderman filed a notice of appeal on November 26, 2007, appealing the Bankruptcy Court's initial Confirmation Order of November 16, 2007. (Remainderman Br. 8-9.)  Remainderman argues that upon filing a notice of appeal, the Bankruptcy Court was divested of jurisdiction to proceed with matters raised by such appeal. (Remainderman Br. 9, ¶ 1.)

Remainderman argues that the Bankruptcy Court did not have jurisdiction to enter the Amended Plan.  (Remainderman Br. 8, ¶ 2.)  Remainderman argues the general rule of jurisdiction that the Bankruptcy Court was divested of jurisdiction upon filing of Remainderman's notice of appeal.  (Id.)  Before reaching the merits of Remainderman's argument regarding the bankruptcy court's jurisdiction, this Court must address whether Remainderman has standing to appeal.

This Court concludes that Remainderman is not an aggrieved party, with respect to this issue.  Remainderman makes a conclusory statement that "the bankruptcy court's modification of the Confirmation Order is the direct result of the appeal filed by the Remainderman with respect to the original Confirmation Order."  (Remainderman Br. 9, ¶ 2.)  "The modification granted has the effect of accelerating the effective date of the Confirmation Order harming the Remainderman's interest and defeating his ability to successfully carry out his appeal."  (Id.) However, Remainderman fails to articulate how the modification to the Confirmation Order harms Remainderman's interest or defeats its ability to successfully carry out its appeal. Further, Remainderman fails to articulate how the Bankruptcy Court's order directly and

---

[14](...continued)
district court divests a bankruptcy court of jurisdiction to proceed with matters raised by such appeal.  In re St. Clair, 251 B.R. 660, 669 (D.N.J. 2000); In re Statistical Tabulating Corp, 60 F.3d 1286, 1289 (7th Cir. 1995).

adversely affects it or serves to diminish its property, increase any burden on Remainderman, or impair Remainderman's rights.  The absence of such a showing undermines any argument that Remainderman has standing.  This Court finds Remainderman does not have standing to appeal this issue.

Remainderman's lack of standing to appeal renders moot Remainderman's previously raised issue regarding the bankruptcy court's jurisdiction to enter Debtor's Amended Confirmation Plan.

**2.  Whether executory agreements purported to be assumed under the Fourth Amended Plan of Reorganization of Lynx Associates, L.P., may be assumed without curing defaults.**

The Remainderman asserts that the Bankruptcy Court erred in approving the Debtor's Plan without requiring Debtor to cure alleged defaults relating to the assumption of the Las Vegas and Independence Operating Leases.  (Remainderman Br. 14, ¶ 2.)  Under the current Plan, the Debtor assumes the Operating Leases for the Las Vegas and Independence Properties. Kmart assigned these Operating Leases to Debtor as part of Kmart's bankruptcy proceedings. Remainderman argues that Debtor became obligated to pay rent on the Las Vegas and Independence Properties upon taking assignment of the Operating Leases in the Kmart bankruptcy.  (Id. 14-15.)  Further, Remainderman argues that Debtor's failure to pay these rents constitutes a default.  Remainderman also asserts that the leases should be cured prior to assumption under this Plan, pursuant to 11 U.S.C. § 365(b)(1).[15]  Remainderman further argues

---

[15] Section 365(b)(1) states, in relevant part, "[i]f there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of the assumption of such contract or lease, the trustee (A) cures . . . such default . . . (B) compensates . . . for any actual pecuniary loss to such party resulting from such default; and (C) provides adequate assurance for future performance under such contract or

(continued...)

that "failure to cure these defaults results in the Remainderman's interest being encumbered by a Mortgage that was not paid down by the cure payments required by the Bankruptcy Code."  (Id. 15, ¶ 1.)

Remainderman fails to articulate a direct or adverse affect of the Bankruptcy Court's order that diminishes its property or impairs its rights.  Under the Debtor's Amended Plan, as confirmed, Remainderman retains the remainder interest in the property.  Further, Remainderman is not a party to the terms of the Operating Leases.  The Operating Leases and the obligations that run from such leases, run from the Debtor to the Trustee.  (Confirmation H'rg Tr. 54:7-11, November 14, 2007)  Remainderman is not entitled to any rent payments. Rather, the Debtor's obligation to pay rent runs to the Trustee only.[16]

This Court acknowledges that an encumbrance, such as mortgage debt, on the Properties could increase Remainderman's financial burden.  Remainderman's argument is based on the possibility that the Las Vegas and Independence Properties may be encumbered by a Mortgage when the Remainderman's remainder interest vests.  (Remainderman Br. 11 ¶¶ 1-3.) Remainderman alleges that the Operating Leases were structured to create an income stream to pay down the Mortgages but points to no contract or agreement that requires rent to be used to pay down the mortgage or even that the mortgage must be paid in full prior to the vesting of

---

[15](...continued)
lease."  11 U.S.C. § 365(b)(1); accord In re Rickel Home Centers, Inc., 209 F.3d 291, 298-99 (3d Cir. 2000).

[16] Under the assignment of the Operating Leases in the Kmart bankruptcy, Debtor is obligated to pay rent to Trustee.  However, this obligation is only triggered if the Property is occupied by a tenant.  Currently, the Las Vegas and Independence Properties are unoccupied, so Debtor is not obligated to pay rent as to these Properties.  (Confirmation H'rg. Tr. 27:8-16; 33:21-23, November 14, 2007.)

14

Remainderman's future interest.[17]  (Id.)  Remainderman fails to articulate a direct affect or any direct relationship between the Operating Leases and Mortgages other than its remainder interest in these Properties.

This Court finds that Remainderman is not directly affected by the order of the Bankruptcy Court with respect to the Operating Leases, and therefore is not a person aggrieved. Accordingly, this Court concludes that Remainderman does not have standing to appeal the Bankruptcy Court's grant of assumption of the Las Vegas and Independence Operating Leases without curing the alleged default.  However, this Court does not make any determination or findings as to the validity of the assumption of the executory agreements as they relate to 11 U.S.C. § 365(b)(1).  This Court holds only that Appellant does not have standing to appeal this issue.

**3.  Whether the Bankruptcy Court erred in granting releases of non-debtor parties**

Remainderman asserts that the Bankruptcy Court erred in granting releases of the non-debtor parties as provided in Sections 5.11[18] and 8.1(b)[19] of the Plan.[20]  Remainderman argues

---

[17] The Plan states in relevant part, "[n]otwithstanding anything to the contrary in the Plan, any amount under any Mortgage . . . that shall not be repaid in full by the Debtor shall remain owing under the respective Mortgage (which Mortgage shall remain outstanding, shall not be released and shall continue in full force and effect as security for any such amount, it being understood that such Mortgage shall be non-recourse as to the Debtor, the General Partner, or other Assets of the Debtor), and any and all rights of the Trustee to recover such unpaid amount from the remainder estate held by Remainderman are expressly preserved under this Plan." (Amended Plan, § 3.1.)  This provision implies that the Trustee had the right to recover unpaid mortgage amounts from the Remainderman prior to the commencement of the bankruptcy case. However, the remainder interest was conveyed to Remainderman subject to the Security Documents, partially comprised of "a fee mortgage or deed of trust on the Property."  (Restated Disclosure Stmt. 3, ¶ 4.)  Therefore, the Plan provision does not change Remainderman's rights.

[18] Section 5.11 of the Plan states, in relevant part, "[e]xcept as provided in this Plan all payments, distributions and transfers of cash and property under this Plan are in full and final
(continued...)

15

these releases are against bankruptcy policy, while also attempting to illustrate that the Third

---

[18](...continued)
satisfaction, settlement, release and discharge of all Claims . . . against the Debtor, the General Partner, LPC and its affiliates, including, without limitation, Merrill Lynch, of any nature whatsoever.  Except as provided in this Plan, the Confirmation Order shall discharge the Debtor from any debt that arose prior to the Confirmation Date . . . [u]nder no circumstances shall any additional consideration be payable by the Debtor to holders of any such Claim other than as expressly provided under this Plan.  Except as otherwise provided in this Plan, as an integral party and in consideration of the settlement and treatment of Claims and Interest under this Plan, any Persons and holders of any Claims or Interests . . . that received actual or constructive notice of this Plan shall be and are permanently enjoined and precluded from asserting, commencing, or continuing in any manner any actions or from asserting any lien against the Debtor and its respective agents, officers, directors, general and limited partners, members, advisors, affiliates, attorneys, and representatives in such capacity and against any such parties' respective assets or properties, with respect to any Claim or Interest based upon any document, instrument or act, omission, transaction or other activity of any kind or nature arising out of, based upon, or in any way related to the conduct, actions and transactions of the Debtor or any other of the Released Parties through the Confirmation Date."  (Amended Plan, 63-64.)

[19] Section 8.1(b) of the Plan states, in relevant part, that "each holder of a Claim that affirmatively votes in favor of this Plan; each holder of a Claim that takes any Asset or Interest under this Plan; and any limited partner of the Debtor who takes or retains interest in any Asset or Interest under this Plan . . . shall be deemed to forever release, waive, and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities whatsoever against Merrill Lynch . . . and its affiliates and subsidiaries (other than the Lynx Entities) (collectively, the "Releasees"), in connection with or related to the Debtors."

"Each of the Releasors shall be deemed to forever release, waive, and discharge any claims, obligations, suits, judgments, damages, debts, rights, causes of action, and liabilities whatsoever arising on or prior to the Effective Date in any way relating to the Debtors, the conduct of the Debtor's business, the Chapter 11 Case, the Releasees, or this Plan, that such Releasors may hold in their individual capacities against each holder of a Claim that affirmatively votes in favor of this Plan."  (Amended Plan 68-69.)

[20] The Bankruptcy Court, at the November 14, 2008 Confirmation Hearing, allowed Remainderman a limited right of standing as to the non-debtor releases, due to the broad standing at the trial level.  However, bankruptcy appellate standing is a more restrictive standard, and the party seeking appellate standing must show the order of the bankruptcy court "diminishes their property, increases their burdens, or impairs their rights."  In re PWS Holding Corp., 228 F.3d 224, 249 (3d Cir. 2000).  This Court has determined that Remainderman did not satisfy this higher, more restrictive standard of appellate standing.  In effect, Remainderman was not directly or adversely affected and thus does not have standing to bring an appeal pursuant to this claim.

Circuit has not definitively ruled on the issue of whether non-debtor releases are appropriate and permissible.  (Remainderman Br. 16-18, ¶ 1.); see also Gillman v. Continental Airlines (In re Continental Airlines), 203 F.3d 203, 214 (3d Cir. 2000).

The Third Circuit does recognize that a non-debtor release must reflect the hallmarks of (1) fairness, (2) necessity to the reorganization, (3) the exchange of reasonable consideration, and (4) specific factual findings by the Bankruptcy Court relative to these factors.  In re Continental Airlines, 203 F.3d at 214.  Remainderman argues that these factors have not been satisfied and thus, the Bankruptcy Court erred in granting the non-debtor releases contained in Debtor's Reorganization Plan.  (Remainderman Br. 17.)

This Court concludes that Remainderman is not an aggrieved party regarding the Bankruptcy Court's order granting the non-debtor releases.  The Bankruptcy Court's order does not directly or adversely affect Remainderman's property, increase Remainderman's burdens, or diminish Remainderman's rights.  Remainderman specifically fails to articulate how the Bankruptcy Court's grant of non-debtor releases diminishes its property or increases its burden. Ultimately, the Remainderman retains the right of remainder in the Properties, including the Las Vegas and Independence Properties, irrespective of whether the non-debtor releases are granted. In fact, this Court does not perceive how the non-debtor releases impact Remainderman since the releases only affect holders of claims who voted in favor of the Plan.  (Confirmation H'rg Tr. 5:6-24; 68:6-7, November 14, 2007.)  Remainderman did not vote for the Plan since it was not a holder of a claim under the Plan.  However, every class that did vote for the Plan, voted unanimously and affirmatively for the Plan.  (Id. at 4:23-25.)

The Remainderman alludes to the third element of demonstrating it is an aggrieved

party, namely a diminished right – the denial of due process.  (Remainderman Br. 18, ¶ 2.)
Although not clearly articulated, this Court will briefly address this argument.

Remainderman asserts the Bankruptcy Court's grant of non-debtor releases constitutes a
denial of its due process because these releases bar Remainderman from bringing any legal
action against Merrill Lynch, or its affiliates (collectively "Merrill Lynch"), for continued
"actions which have harmed the Remainderman."  (Id.)  However, as discussed above, the
releases do not bar Remainderman from initiating future legal action against Merrill Lynch.[21]

In addition, Remainderman fails to state specifically the harm which may lead to a
cognizable claim to commence an action against Merrill Lynch.  Despite citing case law
attempting to advance the theory that release of non-debtor parties is disfavored by bankruptcy
policy, Remainderman does not provide any explanation of the harm to it, beyond the
conclusory statement referring to Merrill Lynch's "action[s] which have harmed
Remainderman."  (Id.)  Moreover, Remainderman's claim does not constitute a clear statement
that Remainder will bring an action.  Remainderman provides another conclusory statement
referencing "harm Remainderman may ultimately be responsible for certain losses incurred by
Remainderman, for which the Remainderman may seek to commence an action."  (Id.)  Since
Remainderman is not barred from bringing an action for the alleged harm, albeit conclusory and
unclear, Remainderman's right to bring an action is preserved in the Plan.

---

[21] Further, the Plan contains a provision which states, in relevant part, "[n]otwithstanding anything to the contrary in this Plan, nothing in this Plan shall collaterally estop the Remainderman in any state court foreclosure proceeding relating to any mortgage held by the Trustee on the Remainderman's Interest in any Property (other than any Core Property) from litigating the amount of fees and expenses of the Trustee owing in respect of such mortgage." (Amended Plan, § 3.1 [Bankr. Dkt. 604].)

Remainderman does not articulate how or why the grant of non-debtor releases will constitute a denial of due process, nor does Remainderman establish that any other of its rights or interests are directly affected by the Bankruptcy Court's decision.  This Court finds that Remainderman is not an aggrieved party and therefore does not have standing to appeal the Bankruptcy Court's approval of the non-debtor releases.  As a result, this Court does not make any determination or findings as to the validity of the Bankruptcy Court's grant of non-debtor releases.  This Court holds only that Appellant does not have standing to bring this appeal.

### (4) Whether the Bankruptcy Court erred in finding that Appellant lacked standing to object to confirmation of the Fourth Amended Plan of Reorganization of Lynx Associates, L.P. other than to object to releases of non-debtor parties

This Court will now address Remainderman's issue of standing to object to Debtor's Plan.  The Bankruptcy Court ruled that Remainderman lacked standing to object to Debtor's Plan, other than having limited standing to object to the releases of non-debtor parties.  Unlike the other issues addressed in this Opinion, Remainderman is an aggrieved party because the Bankruptcy Court's decision to deny standing to object to confirmation of the Amended Plan directly impacts Remainderman.

This Court must determine whether the Bankruptcy Court correctly applied the standards for establishing standing.  In reviewing a case on appeal, the Bankruptcy Court's factual determinations will not be set aside unless they are clearly erroneous.  See Mellon Bank, N.A. v. Metro Comm., Inc., 945 F.2d 635, 641 (3d Cir. 1991).  Conversely, a bankruptcy court's conclusions of law are subject to plenary review.  See Metro Comm., Inc., 945 F.2d at 641. The Bankruptcy Court concluded that Remainderman was not injured and did not have standing to object to the Plan.  (Confirmation H'rg. Tr. 54:20-21, November 14, 2007.)  That is, the

19

Bankruptcy Court observed that "[t]he fact that there's some maybe ultimate impact on the [R]emainderman is not enough to give the [R]emainderman standing." (Id. 54:13-14.)

Remainderman argued its standing was based upon two broad theories: waste[22] and cure. (Confirmation H'rg. Tr. 20:11-13, November 14, 2007.)   Remainderman argues that it has a direct economic interest due to the fact that it is a party to the Three-Party Agreements and Option Agreements which include the Las Vegas and Independence Operating Leases subject to assumption by the Debtor under the Plan.[23] Remainderman argues that its status as a party to the Three-Party Agreements, which relate to the Las Vegas and Independence Operating Leases, qualifies as a "direct impact" and should give Remainderman sufficient standing to be heard on "the circumstances they could be assumed" and "[w]hether or not such contracts were capable of being assumed." (Remainder Br. 10, ¶ 1.)

Remainderman argues that Debtor's failure to pay rent was a violation of Debtor's duty to Remainderman not to commit waste.[24]   Remainderman asserts that Debtor was obligated to

---

[22] Waste is "any damage to real property by a tenant which lessens its value to the landlord, owner or future owner." http://dictionary.law.com.

[23] Under the current Amended Plan, Debtor assumes the Las Vegas and Independence Operating Leases.  Remainderman asserts that it is a party to these Operating Leases being assumed by the Debtor since Remainderman is a party to the Three-Party Agreement and Option Agreement initially conveyed by LPC.  Pursuant to the Three-Party Agreements, LPC leased its interests in the Properties to Malease; conveyed an Estate for Years to Debtor; and conveyed a remainder interest to Remainderman.  In addition, upon conclusion of the initial lease periods, Remainderman granted Debtor an option to lease each Property for an initial term and consecutive renewal terms.  Remainderman asserts that "Debtor assumes certain agreements between the Remainderman and the Debtor."  (Remainderman Br. 10, ¶ 1.)  The Three-Party Agreements are not between the Remainderman and Debtor.  One of the only relationships created between the Debtor and Remainderman as a result of the Three-Party Agreements is that of current estate holder and Remainderman.  (See Restated Disclosure Stmt. 4, ¶¶ (A)-(D).)

[24] Remainderman cites Capital Bankers Life Ins. Co. v. Amalgamated Trust & Savings Bank, No. 92 C 4480, 1993 WL 594103, (N.D. Ill. May 6, 1993); Travelers Ins. Co. v. 633 Third

pay rent under the Operating Leases assigned to Debtor as a result of the Kmart bankruptcy. (Remainder Br. 10, ¶ 2; 11, ¶¶1-2.)   Remainderman asserts that the Operating Leases created a stream of payment to ultimately satisfy the Mortgages prior to the vesting of Remainderman's remainder interest.  (Id. 10, ¶ 2.)  Remainderman further argues that the failure to pay rent will cause the foreclosure and extinguishment of Remainderman's rights in the Properties.  (Id. 11, ¶ 2.)

This Court must review the Bankruptcy Court's decision regarding standing to determine whether it correctly concluded Remainderman was not a party in interest due to its lack of a sufficient stake in the proceedings, and therefore lacked standing.  In re Amatex Corporation, 755 F.2d 1034, 1042 (3d Cir. 1985).  The concept of sufficient stake is in line with the principle of a party's broad right to participate in the early stages of a bankruptcy proceeding.  Id. Remainderman is appealing a decision of the Bankruptcy Court that may directly impact this broad right of participation in the bankruptcy proceeding.  The standard of sufficient stake is a standard that carries a lower threshold than the more restrictive approach to bankruptcy appellate standing, as addressed supra.  See In re Combustion, 391 F.3d at 214, n. 21 ("[The] restrictive approach to bankruptcy appellate standing contrasts with the broad right of participation in the early stages of bankruptcy proceedings.").  Even under the more broadly interpreted standard of sufficient stake, Remainderman must still qualify as a party in interest in order to have standing to object to Debtor's Plan.

---

Assocs., 14 F.3d 114 (2d Cir. 1994); and Strauss v. Wilsonian Inv. Co., 171 Wash. 359 (1933) to support the theory of Debtor's waste.  However, the cases focus on the failure to pay real estate taxes as an act of waste.  Remainderman's reliance on these cases to establish waste are misplaced, since the nexus of Remainderman's argument is that of payment of rent on an operating lease and not that of failure to pay real estate taxes.

Section 1109 of the Bankruptcy Code defines a party in interest as a "debtor, the trustee, a creditor's committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee."  The Third Circuit has stated that the term "party in interest" "is not limited by the small list of examples in § 1109(b)."  In re Amatex Corporation, 755 F.2d at 1042.  "The term party in interest must be construed broadly to permit parties affected by a chapter 11 proceeding to appear and be heard."  Id. (citing 5 Collier on Bankruptcy ¶ 1109(b), at 1109-22.1 to 1109-23).  The basis of determining whether a party is a party in interest is the determination of whether a party has a "sufficient stake in the proceeding so as to require representation."  Id.; In re American Appliance, 272 B.R. 587, 595 (Bankr. D.N.J. 2002).  A sufficient stake to be considered a party in interest can be a pecuniary interest that is directly or adversely affected by the proceedings.  Baron & Budd, P.C. v. Unsecured Asbestos Claimants Committee, 321 B.R. 147, 158 (Bankr. D.N.J. 2005).  Courts must determine on a case by case basis whether a prospective party in interest has a sufficient stake in the proceeding so as to require representation.  In re Amatex Corporation, 755 F.2d at 1042.

The Bankruptcy Court concluded that Remainderman was not a party in interest, as defined pursuant to Section 1109(b), and did not have standing to object to the Amended Plan. The Bankruptcy Court found, as to Remainderman's argument of Debtor's obligation to pay rent, that the "Debtor's obligations ran to the Trustee and certificate holders" for whom the Trustee was acting as a fiduciary.  (Confirmation Hr'g. Tr. 53:7-9; 54:7-14, November 14, 2007.).  Further, the Bankruptcy Court stated that "[t]here is no waste claim filed, no concrete description of waste, just these sort of general allegations that Remainderman could be affected by Debtor's plan, and it's simply not apparent."  (Id. 40:11-15.)

22

In addition, the Bankruptcy Court did acknowledge that a lien may be on the property "which the remainderman's interest adheres," but found the impact as to Remainderman to be undefined.  (Id. 50:6-7.)  The Bankruptcy Court held that "the fact that there's some maybe ultimate impact on the Remainderman is not enough to give Remainderman standing." (Id. 54:13-14.)  Ultimately, the Bankruptcy Court did not find the economic interest of Remainderman to be of a sufficiently concrete nature to confer standing.  (Confirmation Hr'g. Tr. 39:1-7, November 14, 2007.)

This Court concludes the Bankruptcy Court correctly applied the proper standard regarding determining whether Remainderman was a party in interest and affirms the Bankruptcy Court's finding that Remainderman does not have standing to object to Debtor's Amended Plan.

## <u>CONCLUSION</u>

In the instant case, this Court concludes that Remainderman does not have standing to appeal the order of the Bankruptcy Court confirming Debtor's Plan.  Remainderman failed to show that it is an aggrieved party as to the issues of: (1) whether the Bankruptcy Court had authority to enter the Modified Confirmation Order, following the filing of the Notice of Appeal with respect to the Confirmation Order; (2) whether executory agreements purported to be assumed under the Fourth Amended Plan of Reorganization of Lynx Associates, L.P. may be assumed without curing defaults; and (3) whether the Bankruptcy Court erred in granting releases to the non-debtor parties.  This Court finds that Remainderman did not have standing to pursue these issues on appeal.  Therefore, the appeal as to those issues is dismissed.

In addition, this Court concludes that the Bankruptcy Court applied the proper standard

regarding sufficient stake to be shown as to Remainderman's issue of whether the Bankruptcy Court erred in finding that Appellant lacked standing to object to confirmation of the Fourth Amended Plan of Reorganization of Debtor.  This Court affirms the Bankruptcy Court's finding that Remainderman does not have standing to object to the Debtor's Plan.

Dated: January 15, 2009

                                                         S/Joseph A. Greenaway, Jr.
                                                        JOSEPH A. GREENAWAY, JR., U.S.D.J.

24